**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

                                                DECISION AND ORDER
        -v-                                      08-CR-6087 CJS


MOHAMED AL HURAIBI,

                        Defendant.

_____

## INTRODUCTION

        The defendant, Mohamed Al Huraibi, stands accused of eight counts in a

ten-count indictment charging him with crimes relating to money laundering. In the

defendant's omnibus motion, he moved to suppress statements he purportedly made on

February 24, 2007, as well as evidence seized on February 24, 2007 from 651 and 653

Jefferson Avenue.[1]

        In regard to the defendant's application, an evidentiary hearing was held on

March 25, 2009. Special Agent Matthew Meyer ("Meyer") of the Department of

Homeland Security Immigration and Custom Enforcement ("ICE"), Investigator Stephen

Filipowicz ("Filipowicz") of the New York State Police and Hammad Mohamed Hammad

("Hammad"), an Arabic interpreter with the FBI, testified at the hearing.

_____

        [1]The defendant did not move to suppress money seized from 1930 Clifford
Avenue.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Meyer is currently employed by ICE as a special agent, and has been so employed since 1995. He presently is assigned to a unit that conducts child exploitation investigations. In 2007 he was assigned to the Joint Terrorism Task Force. On February 24, 2007, pursuant to his duties with ICE, Meyer participated in the execution of an arrest warrant on the defendant. He was accompanied by a number of other police officers, including Special Agent Siuda of ICE and Investigator Filipowicz of the New York State Police. Law enforcement had information that the defendant was working at his business, MoJoes Star Restaurant ("MoJoes") located 651 Jefferson Avenue in the City of Rochester. Above MoJoes, in the building in which it was located, was an apartment with access in the rear and with the address of 653 Jefferson Avenue. The team of officers went to MoJoes, and upon arriving at 5:45 p.m., only three, Meyer Siuda, and Filipowicz, went inside the restaurant. They were all in plain clothes and their weapons were concealed. Upon entering, Meyer observed the defendant behind the counter. Accompanied by Siuda, and Filipowicz, Meyer approached the defendant, identified himself as an immigration customs enforcement officer, and advised the defendant that he would like to speak to him about his identity, background, and military experience. Meyer spoke to the defendant in English. The defendant, who was then fifty

years old,[2] responded in English words to the effect of "okay."

Meyer did not, at that time, execute the arrest warrant for the defendant. This was because law enforcement had information that the defendant had been a military intelligence officer. Therefore, prior to the execution of the arrest warrant, the defendant was questioned in English about his background as an intelligence officer and whether he knew of any other intelligence officers in the area. The defendant responded in English that he had been an intelligence officer in the Yemen military, which was like the C.I.A. , and he identified two other individuals who had held similar positions in Yemen, one who now lived in Buffalo and one who lived out of state. Meyer had no difficulty in understanding the defendant's responses.

Meyer proceeded to explain to the defendant in English that he and the other officers were conducting an investigation into people who were supporting Hezbollah, and he asked the defendant if he could show him some photographs. The defendant agreed, and, still at the front counter, Meyer showed him the first of sixteen color photographs. Upon viewing the initial photo, the defendant paused, nervously looked around, and asked Meyer and the other officers to come to the back of the business. At the defendant's direction, they all then moved to a back room at MoJoes, which contained a table and a cooler. There, Meyer continued showing the defendant the photographs. The defendant identified two of the individuals depicted in the photographs. With respect to the first photograph he was shown, he identified a person who he indicated he knew as Jamal. Meyer wrote down, "yes, he identified him," wrote

[2]According to Exhibit # 3501A, received into evidence, the defendant was born on January 1, 1957.

down the name Jamal, and asked the defendant to initial the photograph, which the defendant did. The defendant was asked to initial all of the photographs that he was shown, regardless of whether he recognized anyone, which he did. The second individual that the defendant identified in the photographs was a person he said he knew as Kamal. Meyer asked the defendant how he knew Jamal and Kamal, and the defendant replied that he had met Jamal, as well as Kamal, at various social occasions. Meyer further asked the defendant if on any occasion when he was with Jamal and Kamal, there was any discussion of Hezbollah[3] or weapons, or if he had ever sent any money overseas for either one. The defendant responded that he did not recall any discussion of Hezbollah, but that he had taken money from Jamal and Kamal and sent it overseas. The defendant also indicated that the last time that he met Jamal and Kamal was approximately a week ago, at which time he was given $10,000, a portion of which he had not sent out of the country yet. The defendant was asked to clarify where that portion of the money was, and he indicated that he purchased some phone cards with some of the money and that the remainder, approximately $4,500 in cash, was in a paper bag behind the counter of another business, and not in MoJoes.

Meyer next asked the defendant if he would take them to the place where the money was located, which turned out to be 1930 Clifford Avenue, and the defendant agreed to do so. All this time, Meyer was speaking to the defendant in English, and the defendant responded appropriately to his questions and directions. Although occasionally the defendant indicated that he did not understand a particular word, Meyer

[3]In its State Department report for 2008, the U.S. government labeled Hezbollah as the world's most effective terrorist organization.

would simply use another word and continue the conversation.

Meyer, accompanied by other officers and the defendant, then left MoJoes and proceeded to Meyer's vehicle, with the understanding that the defendant was going to take them to the place where the money was located. Upon arriving at the car, they got in, and, at that point, the arrest warrant for the defendant was executed. The defendant was advised that he was under arrest, and he was placed in handcuffs. At 6:20 p.m., after the defendant was arrested and while inside the car, Meyer advised the defendant of his constitutional rights by reading from Exhibit # 3, an Advice of Rights Form. Meyer first completed the top of Exhibit # 3 by writing down the location, "651 Jefferson, Roch, NY," the date, "2/24/07," and the time, "1820." Meyer read to the defendant verbatim in English the following portion of the Exhibit # 3:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you can not afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

After doing so, Meyer asked the defendant "if he understood that his rights were read to him and just to sign the form acknowledging his rights were read to him." (Hearing Trans. p. 20, lines 6-8) The defendant then signed Exhibit # 3 immediately underneath

the portion read to him by Meyer. Meyer then witnessed the defendant's signature. Meyer did not read to the defendant the waiver portion of Exhibit # 3, which appears below the portion of the form that he did read. The waiver portion reads:

> I have read this statement of my rights and I understand what my rights
> are. At this time, I am willing to answer questions without a lawyer present.

Meyer did not read the waiver portion, since he had another form which was an Arabic translation of Exhibit # 3, which he planned to provide to the defendant before they went into 1930 Clifford Avenue, where the defendant indicated the remainder of the money was located, to make sure that the defendant understood his constitutional rights fully.

With the defendant providing directions, Meyer drove to 1930 Clifford Avenue at which a business, the Quick Stop Mini-Mart, was located. The defendant was not questioned during the car ride to 1930 Clifford Avenue. Upon arriving at 1930 Clifford Avenue, the car was parked by the business, and, while inside the car, Meyer pulled out Exhibit # 4, an Advice of Rights Form, which was in Arabic. Meyer completed the top of Exhibit # 4 by writing down the location, "1930 Clifford, Roch, NY," the date, "2/24/07," and the time, "1842." He then handed Exhibit # 4 to the defendant and asked him if he could read it. The defendant indicated that he could. Meyer, utilizing Exhibit # 3, the Advice of Rights Form in English, proceeded, at 6:42 p.m., to again read to the defendant his rights aloud in English, and this time, as Meyer was doing so, the defendant was able to read his rights in Arabic from Exhibit # 4. After he read the defendant his rights in English, while the defendant read them in Arabic, Meyer asked the defendant if he understood his rights and if he was still willing to speak to him and the other officers. The defendant replied that he was willing to speak. Meyer next asked

the defendant to sign Exhibit # 4, indicating that he was willing to waive his rights and speak to the officers. In response, the defendant signed Exhibit # 4 at 6:53 p.m. At no time did the defendant ever indicate that he wanted an attorney, nor did he ever indicate to Meyer that he did not understand what he was saying, or that he did not want to speak to him.

At the time Meyer filled out Exhibit # 4, the Advice of Rights Form in Arabic, he also completed Exhibit #5 an Arabic translation of a Consent to Search Form. In the middle of the Exhibit # 5, Meyer wrote in English "1930 Clifford, Rochester, NY, Quick Stop Mini-Mart. Mohamed K. AlHurabi gives agents permission to retrieve approximately $4,500.00 in a paper bag in business. This is some of the money Kamal LNO gave to AlHurabi (me) last week." Then Meyer, using Exhibit # 7, a blank English Consent to Search Form, from which Exhibit # 5 was translated, read aloud in English lines one through four on the form, as the defendant followed along on Exhibit # 5. Specifically, Meyer read:

> I have been asked by special agents of the Federal Bureau of Investigation to permit a complete search of . . . I've been advised of my right to refuse consent. I give this permission voluntarily. I authorize these agents to take any items which they determine may be related to their investigation.

After doing so, Meyer asked the defendant if he understood everything and if he was willing to sign the Consent to Search Form. The defendant indicated that he understood the form and signed it. Meyer witnessed his signature. At no time while he was reading to the defendant either the Advice of Rights Form or Consent to Search Form, in his vehicle outside of 1930 Clifford Avenue, did Meyer ever display his weapon, use any force against the defendant, threaten him in any way, or make him any promises to get

him to cooperate.

After the defendant signed Exhibit # 5, Meyer unhandcuffed him, and they walked inside the Quick Stop Mini-Mart. Once inside, the defendant led Meyer and to where the money was located. The defendant moved a box, pulled out a brown paper bag, and handed it to Meyer.

After recovering the money, Meyer and the defendant proceeded back to the car, the defendant was again handcuffed, and they returned to MoJoes. Upon arriving at MoJoes, while in the vehicle, Meyer presented the defendant with Exhibit # 6, a second Consent to Search Form in Arabic. In the middle of Exhibit # 6, Meyer printed "My apartment at 653 Jefferson Ave. Rochester, and my business MoJoe's Star at 651 Jefferson Ave Rochester, NY." Meyer asked the defendant if it was okay to search his business for the phone cards that he claimed were there and then his apartment above his business. As he had done previously, Meyer read aloud Exhibit # 7, the English version of the Consent to Search Form to the defendant, as the defendant followed along on Exhibit #6. After Meyer had done so, the defendant indicated that he was willing to allow the search and signed Exhibit # 6. Meyer witnessed his signature. The defendant never indicated that he did not understand the form, or that he did not want to sign it. Meyer never displayed his weapon or used any force against the defendant to get him to sign Exhibit # 6; nor did Meyer ever threaten the defendant or make him any promises to get him to sign Exhibit # 6.

After Exhibit # 6 was signed, Meyer unhandcuffed the defendant and went into MoJoes with him. Once inside, the defendant led Meyer and other officers to a shelf located under the counter, where he pulled out a box full of phone cards. He indicated

that he purchased the phone cards with the money given to him by Jamal and Kamal. Pursuant to the defendant's consent as reflected on Exhibit # 6, Meyer and the other officers searched the apartment at 653 Jefferson Avenue, and seized photographs, documents, and similar items. The search of 653 Jefferson Avenue took approximately thirty-five minutes.

Then, In response to a question put to him by Meyer, the defendant indicated that he had an expired Yemen passport that was in a location other than 653 Jefferson Avenue. After the search of 653 Jefferson Avenue, Meyer and the defendant drove to other locations in an attempt to recover the passport, but were unsuccessful.

Subsequently, the defendant was taken to the Federal Bureau of Investigation ("F.B.I.") office in the Federal Building in Rochester, arriving at about 8:52 p.m. More specifically, he was taken to a break room within the F.B.I. office, where he and Meyer sat down at a table. Also seated at the table were Agent Stillman and the Arabic interpreter, Hammad, who had flown in from Portland, Oregon on February 24, 2007 to assist in the execution of arrest and search warrants. Up to that point, the defendant and Meyer had spoken to each other strictly in English. In that regard, the defendant never indicated that he did not understand what Meyer was saying, and Meyer had no difficulty understanding the defendant. Nonetheless, the presence of an interpreter was pre-planned because it was standard procedure when an individual, such as the defendant, was going to be interviewed thoroughly.

Hammad was born in Beirut, Lebanon in 1970, and less than a year later, he moved to Saudi Arabia, where he lived for eleven years. His native language is Arabic. He attended school in Saudia Arabia, where the instruction he received was in Arabic.

From Saudia Arabia, he moved to Jordan and lived there for six years. In Jordan, he continued his schooling with instruction in Arabic, but also began training in English, which continued during the entire six years in Jordan. He left Jordan and returned to Lebanon to attend the American University in Beirut, where he studied mechanical engineering. His classes in mechanical engineering at the university were conducted in English, and, while at the university, he also furthered his training in English. After approximately a year and a half at the American University, he left Beirut because of the civil war in Lebanon and emigrated to the United States, where he attended school at the University of Wisconsin Parkside. While his primary area of study was mechanical engineering technology, he continued receiving instruction in English and ultimately graduated *cum laude* with a Bachelor's degree. Following his graduation, he continued to reside in Wisconsin, working for ITO Industries as a pre-production engineer. He then worked for a company in Chicago, Illinois called Kalmus Associates, where he was employed as an inside sales coordinator. Hammad then took a position as a sales engineer with Passage International in Portland, Oregon, which he held from 1998 to 2001. In 1999, while working at Passage International, he became an American citizen.

In October or November of 2001, Hammad applied for a job with the FBI, and in March of 2004, he was hired as a contract linguist. In that regard, he received training in Washington, D.C. in proper methods of translation and interpretation. Subsequently, in April of 2006, Hammad received four weeks of training in Arabic, and specifically in the Yemeni dialect at Fort Gordon in Augusta, Georgia. After passing his training at Fort Gordon, he was assigned to temporary deployment at the U.S. Embassy in Sanna, Yemen, where he worked as an interpreter. While on assignment, he interacted with the

citizens of Yemen and had no problems communicating with them in their native language.

After the defendant was seated at the table with Meyer, Stillman, and Hammad, Meyer asked Hammad to go over the Advice of Rights Form with the defendant to make sure that the he fully understood his rights and that he did not have any questions before they continued. Hammad did so, and then the defendant was again asked if he understood his rights and was willing to speak to the officers. The defendant agreed and Meyer started asking him further questions. At the outset of this interview, Meyer explained to Hammad that he had been conversing with the defendant in English, and wanted him present just in case the defendant had any questions. However, during the interview, which lasted approximately thirty-five minutes, Hammad barely spoke at all. The interview was conducted in English. The defendant's answers to the questions put to him were responsive, and the defendant never indicated that he did not understand what was being said. On occasions where Meyer asked the defendant a question and the defendant appeared to Meyer to have a puzzled look on his face, Meyer utilized Hammad to make sure the defendant understood the question. At no time during the thirty-five minute interview did Meyer ever threaten the defendant, use force against him to get him, or make him any promises to get him to cooperate. Moreover the defendant never asked for a lawyer or asked that the questioning stop.

**CONCLUSIONS OF LAW**

**A.     Suppression of Statements**

The defendant has moved to suppress any statements he purportedly made to law enforcement on February 24, 2007 on two grounds. First, he maintains that any statements made to Meyer in MoJoes, prior to the execution of the arrest warrant, must be suppressed, since they were the product of a custodial interrogation in the absence of *Miranda* warnings. Second, he argues that any further statements that he made must be suppressed, since the government has failed to prove that he knowingly, intelligently, and voluntarily waived his constitutional rights. The Government opposes, contending that prior to the execution of the arrest warrant, the defendant was not in custody and that, after he was arrested, and before he made any statements which the government seeks to introduce, the defendant was in fact given his *Miranda* warnings and did validly waive his rights.

For *Miranda* to apply, a defendant must be in custody. *United States v. Titemore*, 437 F.3d 251, 260 (2d Cir. 2006). In other words, "a suspect is entitled to *Miranda* warnings only if he or she is interrogated while 'in custody.'" *Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir.), *cert. denied*, 540 U.S. 1091, 124 S.Ct. 962 (2003). The in-custody test is an objective one: "whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995). As this Circuit has explained:

> it makes sense for a court to begin any custody analysis by asking whether a reasonable person would have thought he was free to leave the police encounter at issue. If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights. On the other hand, if a reasonable person would not have thought himself free to leave, additional analysis is required because, as *Berkemer v. McCarty*, 468 U.S. at

439-40, 104 S.Ct. 3138, instructs, not every seizure constitutes custody for purposes of *Miranda. Cf. Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) ("[I]t is not enough to say a person has been arrested simply because, due to police action, he reasonably believes he is not free to leave."). In such cases, a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest. *See California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517; *see also Stansbury v. California*, 511 U.S. at 322, 114 S.Ct. 1526. Only if the answer to this second question is yes was the person "'in custody' for practical purposes," and "entitled to the full panoply of protections prescribed by *Miranda.*" *Berkemer v. McCarty*, 468 U.S. at 440, 104 S.Ct. 3138.

*United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). Moreover, absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial. *Id.* at 675.

It is, of course, clear that the Government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring,* 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981). Where *Miranda* warnings are required, to establish a valid waiver, the Government must prove that the relinquishment of rights on a defendant's part was voluntary, and additionally that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

A language barrier is certainly a factor to consider when determining the validity of a waiver. *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985), *cert. denied*, *sub nom Heredia-Fernandez v. United States*, 474 U.S. 836 (1985) ("One

precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.") However, the determination is not difficult when the suspect is advised of his rights in a language that he understands. *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987).

Additionally, it is well settled that, to be admissible, a defendant's statements must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir. 1984)).

The Government bears the burden of proving by a preponderance of the evidence both that a defendant, having been advised of his constitutional rights guaranteed under *Miranda*, knowingly, intelligently and voluntarily waived his rights, and that any statements that he made were voluntary. *Lego v. Twomey*, 404 U.S. 477, 482-89 (1972).

### 1.    Statements Prior to the Execution of the Arrest Warrant

Based upon the applicable principles of law and its its findings of fact, the Court first determines that the Government has established by a preponderance of evidence that the defendant was not in custody when he spoke with Meyer in MoJoes prior to the execution of the arrest. In applying the *Newton* analysis, detailed above, the Court considers the totality of the circumstances. Three law enforcement officers, Meyer, Filipowicz, and Siuda

approached the defendant inside MoJoes. All were in plain clothes and none of the three had his weapon drawn or even visible. The defendant was not placed under arrest in MoJoes, nor was he handcuffed or restrained in any way. At the time, the defendant was fifty years old. The encounter occurred in surroundings with which the defendant was very familiar, his business, located directly below his residence. It was in the late afternoon when the officers entered the MoJoes, at a time when the store was open for business. Meyer indicated to the defendant, who had been an intelligence officer with the Yemen military and who was conversant in English, that he would like to speak to him concerning his background, as well as his knowledge of any other former Yemen intelligence officers in the area. The defendant agreed to speak with Meyer, and then agreed to view the photographs which Meyer asked if he could show to him. When he became nervous when Meyer displayed the first of the photographs, it was the defendant who directed Meyer, Filipowicz, and Siuda from the front counter area to the back of MoJoes. Subsequently, when asked about a portion of money that he had been given by two individuals, Jamal and Kamal, that had not been sent overseas, the defendant agree to take Meyer and the other officers to the location of the money. There is no evidence that, within MoJoes and prior to the execution of the arrest warrant, that the defendant was in any way physically abused, threatened or made any promises to gain his cooperation.

Accordingly, the Court concludes, by a preponderance of evidence, that prior to the execution of the arrest warrant and while in MoJoes, a reasonable person in the defendant's position would have considered himself "free to leave the police encounter" and alternatively concludes by a preponderance of evidence that, in any event, a reasonable person would not "have understood his freedom of action to have been curtailed to a degree associated

with formal arrest." *United States v. Newton*, 369 F. 2d at 672.

Additionally, the Court finds by a preponderance of evidence that the defendant's statements were voluntary. As indicated above, Meyer spoke to the defendant for about thirty-five minutes inside MoJoes and there is no evidence that, during that time, he, Filipowicz, or Siuda ever physically abused or threatened the defendant in any way or made him any promises to get him to talk. Furthermore, the defendant clearly was not tricked into speaking, since Meyer, at the outset advised him of the nature of their investigation. In that regard, it is clear *Miranda* warnings need not be delivered in a non-custodial interrogation even if the Government's criminal investigation has reached a stage where the defendant is the focus of the inquiry. *United States v. Burke*, 700 F.2d 70, 84 (2d Cir.). Moreover, there is no evidence that the defendant was subjected to any physical or psychological coercion.

### 2.    Statements Made After the Execution of the Arrest Warrant

Applying the principles of law discussed above to its findings of fact, the Court determines that after the arrest warrant was executed and before any statements were then made, the defendant was advised of his *Miranda* rights and knowingly and intelligently waived such rights. In this regard, prior to the execution of the arrest warrant, Meyer conversed in English with the defendant, who was fifty and a former Yemen intelligence officer, with no apparent difficulty. In that regard, the defendant appropriately responded to the questions he was asked, and never indicated that he had any trouble understanding English. Once outside MoJoes, after he was arrested and placed in the police vehicle, Meyer read to the defendant verbatim line one of Exhibit # 3 as follows: "Before we ask you any questions, you must understand your rights." He then proceeded to read to the defendant verbatim his constitutional rights as they appear on Exhibit # 3. After doing so,

Meyer requested of the defendant "if he understood that his rights were read to him and just to sign the form acknowledging his rights were read to him."In response, the defendant signed Exhibit # 3. Then, prior to any further questioning, after arriving at 1930 Clifford Avenue, Meyer again read the opening line and constitutional rights as they appear on Exhibit # 3, verbatim to the defendant. However this time, in addition, Meyer provided the defendant Exhibit # 4, the Arabic translation of Exhibit # 3, with which to follow along. In response to a question from Meyer, the defendant specifically indicated that he could read Exhibit # 4. After again advising the defendant of his rights, Meyer asked the defendant if he understood his rights and if he was still willing to speak to him and the other officers. The defendant replied that he was willing to speak and, in response to Meyer's request, signed Exhibit # 4 at 6:53 p.m. At no time did the defendant ever indicate that he wanted an attorney, nor did he ever indicate to Meyer that he did not understand what Meyer was saying, or that he did not want to speak to him. Thereafter, the defendant was interviewed for approximately two and a half hours, a relatively short period of time. From 8:52 p.m. until about 9:30 p.m., he was interviewed at the F.B.I. office in the Federal Building. During that period of time, Hammad, the interpreter was present, although he barely spoke at all, since the defendant was responding in coherent English to the questions Meyer put to him in English. Hammad did at the outset ask the defendant if he understood his rights and was willing to talk the officers, and in response, the defendant agreed that he understood and was willing to speak. However, as it turned out, Meyer only called upon Hammad to interpret when it appeared to Meyer that the defendant had a puzzled look on his face. At no time during the thirty-five minute interview did Meyer ever threaten the defendant, use force against him, or make him any promises to get him to cooperate. Moreover the defendant

never asked for a lawyer or asked that the questioning stop. The defendant was not subjected to any type of physical or psychological deprivations, and there is no suggestion of any kind of intimidation, coercion or deception. *See Moran v. Burbine,* 475 U.S. 412, 421 (1986) (relinquishment of rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception"). Viewing the totality of the circumstances, the Court concludes by a preponderance of evidence that the defendant waived his constitutional rights with "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.,* at 69.

Additionally, the Court determines that the Government has established by a preponderance of evidence that the statements of the defendant were voluntary. As indicated above, the defendant, after he was advised of his rights, was interviewed, during the evening of February 24, 2007, for only about two and a half hours. During that time he was interviewed, the defendant was not threatened in any way, nor were any promises made to him to get him to talk. Furthermore, the defendant clearly was not tricked into speaking, since at the outset, he was advised of the nature of the investigation. Moreover, the defendant never indicated that he did not want to speak to the police or that he wanted an attorney. Finally, the defendant was not subjected to any physical or psychological coercion.

**B.    Suppression of Physical Evidence**

The defendant has moved to suppress items seized by Meyer and other officers on February 24, 2007 from 651 and 653 Jefferson Avenue as violative of his Fourth Amendment rights. The Government opposes the defendant's application and maintains

that the taking items from 651 and 653 Jefferson Avenue was lawful based upon the defendant's voluntary consents.

The general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment–subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception would be a consent search. *United States v. Kon Yu-Leung*, 910 F.2d 33, 40-41 (2d Cir. 1990). The Government, of course, bears the burden of establishing by a preponderance of evidence that consent was voluntarily given. *United States v. Buettner-Januscch*, 646 F.2d 759, 764 (2d Cir. 1981). To be voluntary means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely an acquiescence to authority. *Schneckloth v. Bustamonte*, 412 U.S. at 226; *United States v. Wilson*, 11 F. 3d 346, 351 (2d Cir. 1993); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir. 1996). As to the validity of a consent search, the Second Circuit has offered the following guidance:

> It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes "unreasonable searches," an individual may consent to a search, thereby rendering it reasonable. *See United States v. Kon Yu-Leung*, 910 F.2d 33, 40-41 (2d Cir. 1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 226-27, 93 S.Ct. 2041, 2043-44, 2047-48, 36 L.Ed.2d 854 (1973)); *see also United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1025, ----, ----, 114 S.Ct. 1415, 1563, 2142, 128 L.Ed.2d 86, 209, 870 (1994). To ascertain whether consent is valid, courts examine the "'totality of all the circumstances'" to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Wilson*, 11 F.3d at 351 (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048; other citations omitted); *see*

*also Yu-Leung,* 910 F.2d at 41.

It is also well established that the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context. *See Schneckloth*, 412 U.S. at 241-42, 93 S.Ct. at 2055-56 (explicating "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment"); *see also Rodriguez*, 497 U.S. at 183, 110 S.Ct. at 2798-99. This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are "unreasonable". *See Rodriguez*, 497 U.S. at 183, 110 S.Ct. at 2798. So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search. *Schneckloth*, 412 U.S. at 228, 93 S.Ct. at 2048. Therefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, *id.* at 231-33, 93 S.Ct. at 2049- 50, although it may be a factor in ascertaining whether the consent was coerced. *Id.* at 248-49, 93 S.Ct. at 2058-59; *see also Yu-Leung,* 910 F.2d at 41.

Recent Supreme Court decisions emphasize both that only unreasonable searches are proscribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard.

*United States v. Garcia*, 56 F.3d 418, 422-23 (2d Cir. 1995).

Based upon these applicable principles of law and its findings of fact, the Court concludes that the Government has established by a preponderance of evidence that the defendant's consent to allow officers to search 651 and 653 Jefferson Avenue was voluntary. In reaching its conclusion, the Court considers the totality of circumstances. First, as of February 24, 2007, the defendant was fifty years old. Second, he could speak and understand English and could read and understand Arabic. Third, prior to consenting to the search of 651 and 653 Jefferson Avenue, he had been advised of his *Miranda* rights and explicitly waived his rights. Fourth, Meyer, Filipowicz, and Siuda were in plain clothes, and although they were armed, their weapons were not visible. Fifth, Meyer, at the outset, alerted the defendant to nature of the investigation. Sixth, the defendant was specifically told in English, while given the opportunity to read in Arabic that "I have been advised of my

right to refuse consent," and "I give this permission voluntarily." Seventh, prior to signing Exhibit # 6, the Consent to Search Form in Arabic for 651 and 653 Jefferson Avenue, he was provided and signed an identical form in Arabic for 1930 Clifford Avenue. Eighth, the defendant signed a written Exhibit # 5, the written Consent to Search Form in Arabic for 651 and 653 Jefferson Avenue. Ninth, with respect to 651 Jefferson Avenue, MoJoes, the defendant himself lead officers to a shelf in the store where the phone cards were located. Tenth, Meyer never threatened the defendant or made him any promises to get him to sign Exhibit # 6. Finally, the defendant was coherent and never indicated that he could not understand Meyer.

## CONCLUSION

Accordingly, the defendant's motion (Docket # 94) to suppress statements and physical evidence is denied.

IT IS SO ORDERED.

DATED:      May 21, 2009
            Rochester, New York        ENTER.


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Court Judge