IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA

    v.                                        **STATEMENT OF THE PARTIES**
                                                **Case No. 6:08-cr-6087-CJS**

SALEH MOHAMED TAHER SAEED, et al,

                    Defendant.

---

IN ACCORDANCE WITH LOCAL PROCEDURAL GUIDELINES TO GOVERN SENTENCING PROCEDURES UNDER THE SENTENCING PROCEDURE ACT OF 1984 IN THE WESTERN DISTRICT OF NEW YORK; RULE 32 OF THE FED. R. CRIM. P.; 18 U.S.C. 3553; §6A1.2 OF THE UNITED STATES SENTENCING GUIDELINES ("USSG") AND U.S. V. BOOKER, 125 S. CT. 738 (2005).

## HISTORY OF CASE

## PRE-SENTENCE INVESTIGATION REPORT ("PSR")

## THE OFFENSE:

1.    A jury trial began on August 6, 2009.

2.    From August 6, 2009 to August 27, 2009 the prosecution attempted to prove that the defendants, including Saleh Mohamed Taher Saeed ("Mr. Saeed"), had engaged in a conspiracy to commit the offense of money laundering.

3.    The conspiracy was alleged to have existed from at least April 7, 2005 up to and including February 24, 2007.

4.    In addition to the conspiracy, Mr. Saeed was named in Counts 2-10 which charged Mr. Saeed and the other co-defendants with the violation of 18 U.S.C. §641 and 18 U.S.C. §1546.

5. Count 2 involved the deposit of $5,000.00 by co-defendant Alomari on December 15, 2005 into his Bank of America account.

6. Count 3 involved co-defendant Alomari transferring $3,200.00 from his Bank of America account to a Bank of Arab account in Yemen.

7. Count 4 involved co-defendant Al-Huraibi depositing $12,000.00 on August 15, 2006 into his Chase bank account.

8. Count 5 involved co-defendant Al-Huraibi depositing $7,500.00 on August 16, 2006 into his ESL Federal Credit Union account.

9. Count 6 involved co-defendant Al-Huraibi sending a wire transfer of $7,200.00 on August 16, 2006 from ESL Federal Credit Union to Bank of Bahrain and Kuwait.

10. Count 7 involved co-defendant Al-Huraibi sending a wire transfer of $11,800.00 on August 21, 2006 from his Chase bank account to the Bank of Bahrain and Kuwait account.

11. Count 8 involved Mr. Saeed sending a wire transfer of $15,500.00 on September 26, 2006 from his Citizens Bank account to the Bank of Bahrain and Kuwait.

12. Count 9 involved Mr. Saeed sending a wire transfer of $2,000.00 on October 11, 2006 from his Citizens bank account to the Bank of Bahrain and Kuwait account.

13. Count 10 involved Mr. Saeed transferring $1,500.00 on October 16, 2006 from his Citizens bank account to the Bank of Bahrain and Kuwait.

14. The Indictment also contained substantive counts 11-16 which did not include Mr. Saeed.

15. The jury trial began on August 6, 2009 and ended prematurely on August 27, 2009.

16. On August 27, 2009 only two prosecution witnesses had testified and the cooperating witness ("CW") was on the stand.

17. Because of repeated complications in the prosecution's case which indicated that the trial which had been predicted to last four weeks was estimated to last another four to six weeks. Based on the foregoing, the prosecution agreed to allow the defendants to plead to a One Count Felony Superseding Information.

18. On August 28, 2009 the defendants entered into a written plea agreement and pled guilty to a One Count Felony Superseding Information charging them with a violation of 18 U.S.C. §§1960(a) and (2) to wit: Operating a Money Transmitting Business without First Obtaining an Appropriate License from the State of New York.

## PLEA AGREEMENT

19. A summary of the Plea Agreement contained in the PSR ¶¶13-19 fairly summarizes said agreement.

## PRE-TRIAL ADJUSTMENT

20. From the time of Mr. Saeed's release following approximately 11 months of incarceration to the present time, Mr. Saeed has been compliant with all conditions of release.

## THE OFFENSE CONDUCT

21. ¶23(a) of the PSR correctly describes Mr. Saeed as the operator of the Durnan Mini Mart located at 934 Hudson Avenue, Rochester, New York. Mr. Saeed resides at 936 Hudson Avenue.

22. ¶24 of the PSR is incorrect in the sense that Mr. Saeed should not be charged with transferring approximately $200,000.00. Furthermore, the money transferred by Mr. Saeed was actually not proceeds of specified unlawful activity, nor was all of the money transferred by Mr. Saeed represented to be proceeds of specified unlawful activity.

23. ¶25 of the PSR alleges that Mr. Saeed conducted or was associated with approximately 324 Currency Transaction Reports ("CTR's") totaling approximately 12.3 million dollars between October 2002 to November 2004. Even if these numbers are accurate, the government concedes that said transactions were perfectly legal.

## MONEY LAUNDERING INVESTIGATION

24. Because of the CTR activity by Mr. Saeed referred to in ¶25 of the PSR the government targeted Mr. Saeed and decided to conduct a "sting" operation in order to induce Mr. Saeed to engage in the transfer of monies from the United States overseas.

## TRANSFER OF $15,000.00

25. As part of the "sting" operation, the government entered into an agreement with a cooperating witness who agreed to befriend Mr. Saeed in order to attempt to get Mr. Saeed to assist in the unlawful transfer of monies from the United States to a foreign account.

26. As far as the $15,000.00 transfer is concerned, Mr. Saeed responded to the cooperating witness's request to transfer $15,000.00 to a bank account in Lebanon.

27. Mr. Saeed did not personally transfer the money, instead, Mr. Saeed introduced the cooperating witness to friends that he had in California who ultimately transferred $13,996.99 first to the Bank of Arab in Yemen, which was set up by Mr.

Saeed's brother-in-law, who ultimately transferred the money to a bank account that had been sent up in the CW's name in the Bank of Arab in Lebanon.

28. From the time the cooperating witness induced Mr. Saeed to help with the $15,000.00 transfer up to the time of the transfer, all the cooperating witness had indicated to Mr. Saeed was that the cooperating witness "...could not place this money in a bank, because the CW was unable to explain the source of the money." See ¶28 of the PSR.

29. The transfer of funds from California to Yemen to Lebanon were completed on or about August 20, 2005.

30. It wasn't until August 23, 2005, three (3) days after the money was transferred, according to the government, that the cooperating witness "reminded" Mr. Saeed that the money transferred came "... from fraudulent credit card activity." (See ¶35, last sentence of the PSR)

31. Parenthetically, up to August 20, 2005 according to the government's account in the PSR concerning the $15,000.00 transfer there hadn't been any discussions about fees preceding said transaction.

## DECEMBER 2005 TRANSFER OF $20,000.00

32. Following the August 20, 2005 transfer, the next transaction in which Mr. Mr. Saeed was involved took place in mid-December 2005.

33. Despite the efforts of the cooperating witness to get Mr. Saeed and later Mr. Alomari to produce customers to buy green cards, <u>that never happened</u>.

34. The December 2005 transaction included Mr. Alomari who Mr. Saeed had recruited to help him (Mr. Saeed) to transfer money out of the United States.

35.     The December 2005 transaction involved the CW turning $11,000.00 over to Mr. Saeed on or about December 14, 2005.

36.     On December 14, 2005 the CW told Mr. Saeed that Mr. Saeed could keep $1,000.00 of the $11,000.00. Mr. Saeed kept $500.00 for his helping arrange the August 2005 transfer and another $500.00 for participating in the December 2005 transfer.

37.     According to the PSR, the CW never represented to Mr. Saeed that the $20,000.00 were proceeds of unlawful activity. (see ¶¶36-44 of the PSR)

38.     According to ¶42 of the PSR regarding the $20,000.00 transaction, it wasn't until December 16, 2005 that the CW, while driving with Mr. Alomari to the bank to deposit the portion of the money that Mr. Alomari was to transfer out of the United States, that the CW represented to Alomari that the money came "...from credit card fraud...from you know green card...from you know, food stamps." Mr. Saeed was not present.

39.     It does not appear that a similar representation was made to Mr. Saeed regarding the $20,000.00 transfer.

40.     Mr. Saeed, according to the government, converted $9,950.00 of the $11,000.00 into bank checks and money orders and sent to Mr. Saeed's brother-in-law who deposited them into the Bank of Arab in Yemen and then caused the transfer of money to the Bank of Arab in Lebanon.

41.     The amount that Mr. Saeed caused to be transferred to his brother-in-law does not appear to violate any governmental regulations involving cash transaction reporting.

]

## INTRODUCTION OF UNDERCOVER AGENT ("UCA")

42. Because of comments made at a social gathering, the government brought an undercover agent ("UCA") into the "sting" investigation in order to attempt to turn the investigation into a terrorist prosecution.

43. Despite efforts to turn the "sting" into a terrorist prosecution, Mr. Saeed did not express any interest in participating in transfers of money to support a terrorist organization abroad.

44. ¶46 indicates that Mr. Saeed and Mr. Alomari were competing in order to participate in the transfer of funds abroad and that both Mr. Saeed and Alomari expressed some interest in finding customers for green cards or parole letters but deferred until they had more discussions with their friends.

45. We all know that neither Mr. Saeed nor Mr. Alomari ever participated in the sale of green cards/parole letters.

## TRANSFER OF $60,000.00 IN AUGUST 2006

46. On August 1, 2006 the government opened a bank account in Bahrain.

47. Prior to August 1, 2006 the government was using in the bank account in the Bank of Arab in Lebanon under the control of CW.

48. On August 1, 2006, in a hotel room in Rochester, New York, the CW and UCA turned over $60,000.00 of government money, $20,000.00 each to Mr. Saeed, Alomari, and Al-Huraibi with the representation that part of the money was going to help CW's and UCA's families and part of it was intended to help rebuild Hezbollah, whatever that meant.

49. Mr. Saeed and the other co-defendants were told they could keep $1,000.00 each as their fee for transferring the money.

50. Mr. Saeed was also to be paid an extra $1,000.00 if he (Mr. Saeed) saw to it that the money was promptly transferred to the government's bank account in Bahrain. I do not know if the extra $1,000.00 was ever paid to Mr. Saeed because of his (Mr. Saeed's) delay in sending the money.

51. Alomari and Al-Huraibi promptly transferred their respective portions of the $60,000.00 to the government bank account in Bahrain.

52. On the other hand, Mr. Saeed delayed sending his portion of the $60,000.00 to the government bank account in Bahrain.

53. Mr. Saeed made one transfer on September 27, 2006; a second transfer on October 10, 2006 and a final transfer on October 17, 2006.

54. Because of Mr. Saeed's tardy transfers, the government decided not to utilize Mr. Saeed in any future transactions.

55. In other words, the future transactions involving transfers of government money through this "sting" operation were made only by Alomari and Al-Huraibi.

## NOVEMBER 2006 TRANSFER OF $30,000.00 IN ROCHESTER AND $60,000.00 IN CALIFORNIA

56. As explained above, Mr. Saeed was no longer included in the government's "sting" operation.

57. The transfer of $30,000.00 in Rochester and $60,000.00 in California in November 2006 only involved Alomari and Al-Huraibi and Alomari's California contact.

## FEBRUARY 2007 TRANSFER OF $20,000.00 IN ROCHESTER AND $80,000.00 IN CALIFORNIA TO SUBJECTS

58. The $20,000.00 in Rochester given to Alomari and Al-Huraibi and $80,000.00 transfer to Alomari's California contact did not involve Mr. Saeed.

59. As a matter of fact, neither th $20,000.00 nor the $80,000.00 was ever transferred by Alomari and/or Al-Huraibi to the government account in Bahrain.

60. One could easily argue that as of September 2006 Mr. Saeed was no longer a co-conspirator.

## ARREST OF MR. SAEED

61. On February 24, 2007 Mr. Saeed was arrested based on a Criminal Complaint.

62. One of the most salient parts of Mr. Saeed's post-arrest statement was that he (Mr. Saeed) "loved America."

## VICTIM IMPACT

63. The only possible victim in this case would have been the U.S. Government losing the "sting" money. I do not believe that ever happened.

## OBSTRUCTION OF JUSTICE/RECKLESS ENDANGERMENT DURING FLIGHT

64. Mr. Saeed never engaged in either obstructing justice or ever attempted to flee from a law enforcement officer. Mr. Saeed cooperated with law enforcement immediately following his arrest.

## ACCEPTANCE OF RESPONSIBILITY

65. Mr. Saeed cooperated following his arrest and during the questioning by the government. Mr. Saeed pled guilty to the Superseding Information.

67. Mr. Saeed cooperated fully during the PSR interview.

68. Mr. Saeed, through the help of an Arabic speaking person, has submitted a written statement.

## OFFENSE LEVEL COMPUTATIONS

69. The fact that the Sentencing Guidelines are advisory allows this Court sua sponte a wide latitude in sentencing Mr. Saeed. My hands are tied by the Plea Agreement from arguing for a sentence below the guidelines. But see ¶¶5 and 13 of the Plea Agreement.

70. The fact that this Court sat for four weeks listening to part of the proof offered by the government adds additional information about the case of the government against Mr. Saeed and his co-defendants which should be helpful to this Court in sentencing Mr. Saeed to a reasonable sentence.

## BASE OFFENSE LEVEL

71. Prior to Mr. Saeed being excluded from the "sting" operation, after his tardy transfer of funds, the total amount of government money handled by Mr. Saeed was approximately $95,000.00 if the first $15,000.00 transaction is included.

## SPECIFIC OFFENSE CHARACTERISTICS

72. As has been pointed out above the first transaction involving $15,000.00 all the CW told Mr. Saeed was he couldn't put the money in the bank because he couldn't explain the source of the money.

73. With respect to the $20,000.00 transaction, the only mention of credit card fraud, green card fraud and food stamp fraud was the remark made by CW to Alomari on December 16, 2005 while Alomari and CW were driving to and from Alomari's bank.

74. With respect to the $60,000.00 the only mention in that case was on August 15, 2006 when the CW and UCA told Mr. Saeed and Alomari that part of the money was going to help their (CW and UCA) families and part of it was <u>intended</u> to help rebuild Hezbollah.

75. There was absolutely no proof submitted during the four weeks of trial that Mr. Saeed expressed any belief that the funds were proceeds of unlawful activity. <u>Note</u>: However, in the Plea Agreement and plea colloquy Mr. Saeed admitted such a belief.

76. I question the two-level increase ¶70 of the PSR based on the facts of this case regarding Mr. Saeed. I concede that it was agreed to in the Plea Agreement.

77. ¶70 speculates "...<u>if</u> a defendant (Mr. Saeed) believed the funds were proceeds of unlawful activity, increase by two levels." The "**if**" is weaker than speculation concerning Mr. Saeed's belief of where the funds to be transferred came from.

78. The Plea Agreement prevents me from asking that the 2 level increase not be applied in this case. But see ¶¶5 and 13 of the Plea Agreement.

79. Without the 2 level increase, the advisory guidelines would be a Total Offense Level of 12, Criminal History Category of 1 resulting in a guideline range for imprisonment of 10-16 but of course I cannot propose this due to the Plea Agreement.

### OFFENDER CHARACTERISTICS

80. Mr. Saeed, along with his father, work many hours in a small mini-mart on Hudson Avenue to earn enough money to provide very basic living conditions for themselves and enough money to send to Mr. Saeed's wife and four children who are still in Yemen.

81. As far as physical condition, mental and emotional health, substance abuse, education and vocational skills, and employment record, I concur with the PSR regarding those categories.

## FINANCIAL CONDITION

82. During the PSR interview, the amounts stated in ¶104 of the PSR are purely estimates and fluctuate from month to month.

83. In a most recent development, Mr. Saeed has been notified that his food stamp privileges may be revoked which will cause a decline in business because a number of the people that trade at Mr. Saeed's mini-mart use their food stamp cards.

## MITIGATING AND AGGRAVATING FACTORS FOR THE COURT TO CONSIDER

84. I do not agree with Ms. Chartier that there are no known mitigating circumstances concerning the offense and the offender that would warrant a sentence outside the advisory guideline range.

85. This Court can take into account the factors pursuant to 18 U.S.C. 3553 in sentencing Mr. Saeed. See ¶¶5 and 13 of the Plea Agreement.

86. I request that this Court in sentencing Mr. Saeed impose, sua sponte, a reasonable sentence.

**WHEREFORE**, I respectfully request that this Court, based on the advisory guidelines and 18 U.S.C. 3553, impose a reasonable sentence based on the foregoing.

Dated: November 11, 2009
Rochester, New York

Respectfully submitted,
s/John R. Parrinello
REDMOND & PARRINELLO, LLP
John R. Parrinello, of Counsel
Attorneys for Saleh Mohamed Taher Saeed
36 West Main Street, Suite 400
Rochester, New York 14614
Phone: (585) 454-2321 Fax: (585) 454-6626
e-mail: randplawoffice@aol.com

cc:  Timothy C. Lynch, Esq.
     Paul J. Vacca, Esq.
     Maurice Verrillo, Esq.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NEW YORK

---

THE UNITED STATES OF AMERICA

    v.

SALEH MOHAMED TAHER SAEED, et al,

                Defendant.

**6:08-cr-6087-CJS**

---

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2009 I, Ashley Freeman, electronically filed the foregoing Statement of the Parties with the Clerk of the District Court using its CM/ECF system which would then electronically notify all relevant participants in this case.

s/Ashley Freeman